## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| MANUEL RODRIGUEZ, JUAN RODAS, JUAN FLORES LOPEZ, BERNARDO MARTINEZ, JOSE RIVERA, PEDRO ORELLANA, JOSE BENITEZ, JAIME ALARCON AGUILAR, WILLIAM ORELLANA, MARCOS FLORES, CARLOS MOLINA, VLADIMIR CONDORI, and JHOM MONTANO, | ) ) ) ) ) ) ) | Civ. No.: |
| | ) | JURY TRIAL REQUESTED |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | |
| CAPITAL COMMERCIAL SOLUTIONS, LLC, <br> Serve: Ixel R. Morales, R/A <br> 6300 Lincolnia Road <br> Alexandria, VA 22312 | ) ) ) ) ) | |
| IXEL R. MORALES, | ) ) | |
| KEREN TORRES, | ) ) | |
| *and* | ) ) | |
| CCE SPECIALTIES, LLC, <br> Serve: CT Corporation System, R/A <br> 4701 Cox Road, Suite 285 <br> Glen Allen, VA 23060 | ) ) ) ) ) | |
| *Defendants.* | ) ) | |

## COMPLAINT

### Preliminary Statement

1.    Plaintiffs bring this suit against their former employers, Capital Commercial

Solutions, LLC, Ixel R. Morales, Keren Torres, and CCE Specialties, LLC.

2.    Plaintiffs' claims arise from Defendants' failure to pay minimum and overtime

wages as required by the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA").

1

3. The Court has subject matter jurisdiction over the FLSA claims pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. The court has subject matter jurisdiction over the state law breach of contract claim because it is so closely related to the federal law claims as to form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

4. Because Defendants are domiciled in, and do business in, Virginia, the Court has personal jurisdiction over Defendants.

5. Venue is proper in the Alexandria Division of the Eastern District of Virginia because the events or omissions giving rise to Plaintiffs' claims occurred in Arlington, Virginia. *See* U.S.C. § 1391(b)(2).

## PARTIES

6. Except for Plaintiff Jose Rivera, Plaintiffs are adult residents of Fairfax County. Plaintiff Jose Rivera is an adult resident of Prince George's County, Maryland. All Plaintiffs performed a variety of specialized tasks for Defendants' construction business in Virginia.

7. Defendant Capital Commercial Solutions, LLC ("CCS") is a Virginia corporation. Its registered office is located at 6300 Lincolnia Road, Alexandria, VA 22312. Defendant CCS employs workers to perform construction duties on various projects in Virginia and in Washington, D.C. At all times relevant to this action, Defendant CCS employed Plaintiffs to perform construction work.

8. Defendant Ixel Morales is an adult resident of Fairfax County as well as member and manager of Defendant CCS. Defendant Ixel Morales approved Plaintiffs as employees, arranged work for them, determined the appropriate rate of pay for each role, and purported to pay Plaintiffs. Upon information and belief, he is the husband of Defendant Keren Torres.

2

9.     Defendant Keren Torres is an adult resident of Fairfax County. Upon information and belief, Defendant Keren Torres exercised a position of trust and authority with Defendant CCS. Defendant Keren Torres distributed payments to employees. She also kept records of which employees had received payment, and in what amount. Upon information and belief, she is the wife of Defendant Ixel Morales.

10.    Defendant CCE Specialties, LLC ("CCE") is a Maryland corporation registered to do business in Virginia, with a registered agent in Glen Allen, VA. Defendant CCE employs workers to perform construction duties on various projects in Virginia and in Washington, D.C. At all times relevant to this action, Defendant CCS employed Plaintiffs to perform construction work.

## FACTS

### Defendant CCE Specialties, LLC's Status as Employer

11.    Defendant CCE is a construction company specializing in Cold-Form Metal Framing, Engineered Trusses, Specialty Drywall and Acoustical Ceiling for major residential and commercial construction projects, including but not limited to building secure facilities abroad for the U.S. government. CCE often prefers not to employ construction workers directly, but rather uses various staffing agencies to provide labor for its construction projects in the Washington, D.C. metro area. *See, e.g., Edwin Mendoza-Lopez, et al. v. John Moriarty & Associates, et al.*, 1:16-cv-02341-CRC (D.D.C., complaint filed Nov. 28, 2016) (alleging that CCE, through an intermediary staffing agency, violated the FLSA and DC minimum wage laws).

3

12.     The use of staffing companies, also known as labor brokers, is an increasingly common means for construction subcontractors to attempt to undercut their competitors' prices by avoiding compliance with workers' rights statutes such as the FLSA.[1]

13.     Upon information and belief, at all relevant times, Defendant CCE had an annual gross income volume of business of over $500,000, and at least two employees who are engaged in interstate commerce or who handle, sell, or otherwise work on goods or materials that have moved in interstate commerce.

14.     Upon information and belief, in mid-2016, Defendant CCS was contracted by Defendant CCE to hire workers to perform construction duties on a brand-new luxury apartment building being erected at 1720 S. Eads Street, Arlington, VA 22202.  Defendant CCS then selected and hired all the Plaintiffs to work at the construction site.

15.     Defendant CCE provided a foreman, Francisco (whose last name is unknown to Plaintiffs), to supervise the worksite. Upon information and belief, Francisco is an employee of Defendant CCE.

---

[1] *See, e.g.*, U.S. Department of Labor, Wage and Hour Division, Administrator's Interpretation No. 2016-1, *Joint employment under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act* , available at https://www.dol.gov/whd/flsa/Joint_Employment_AI.pdf ("More and more, businesses are varying organizational and staffing models by, for instance, sharing employees or using third party management companies, independent contractors, staffing agencies, or labor providers. As a result, the traditional employment relationship of one employer employing one employee is less prevalent."); National Employment Law Project report, *Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work* (May 2014), *available at* http://www.nelp.org/content/uploads/2015/02/Whos-the-Boss-Restoring-Accountability-Labor-Standards-Outsourced-Work-Report.pdf ("Business outsourcing is on the rise, through practices such as multi-layered contracting, use of staffing or temp firms, franchising, misclassifying employees as independent contractors, and other means . . . . Lead companies that outsource distance themselves from the labor-intensive parts of their businesses and their responsibilities for those workers."); The Washington Post, *"Department of Labor sends warning shot to clients of temp staffing agencies"* (January 20, 2016), available at https://www.washingtonpost.com/news/wonk/wp/2016/01/20/department-of-labor-sends-warning-shot-to-clients-of-temp-staffing-agencies/?utm_term=.243bbbf53369 ("Subcontracting, outsourcing, and the use of staffing agencies allows businesses to inexpensively scale up and scale down their labor needs, without the extra hassle and liability of adding payroll. But it also adds another layer between workers and the bosses who call the shots, shielding managers from responsibility when the labor provider doesn't follow the law.").

16.     Plaintiffs signed-in with the foreman Francisco at the start of each workday. Upon information and belief, Francisco was the only individual who kept a record of Plaintiffs' hours. Plaintiffs, trusting that the foreman provided by their employer would keep accurate records, did not keep any records of their own hours. The dates and times stated by Plaintiffs in this Complaint are based on Plaintiffs' best memory of the time they worked for Defendants.

17.     The foreman Francisco gave Plaintiffs their assigned daily tasks at the start of the day. Throughout the day, Francisco would move through the worksite, observing the work of the employees and correcting them if they were not doing the work to CCE's standards.

18.     The foreman Francisco had authority to fire employees whose performance was unsatisfactory, for example, if the employee spent too much time talking on the phone or showed poor workmanship.

### Defendant Capital Commercial Solutions, LLC Generally

19.     Defendant CCS operates as a staffing agency or labor broker, employing individuals to perform work on construction projects for other companies. Upon information and belief, Defendant CCS does not operate its own construction sites, but only staffs other companies' construction sites. Defendant CCS assigns the employees to work at various sites with different companies.

20.     Upon information and belief, at all relevant times, Defendant CCS had an annual gross income volume of business of over $500,000 and at least two employees who are engaged in interstate commerce or who handle, sell, or otherwise work on goods or materials that have moved in interstate commerce.

21.     Employees were generally recruited by word-of-mouth, but Defendant Ixel Morales had the final say in whether an employee was hired to work for Defendant CCS.

22.     Plaintiffs were employed by Defendants to work at the 1720 S. Eads Street, Arlington, VA 22202 worksite.

23.     Defendant Ixel Morales determined Plaintiffs' rate of pay.

24.     Defendant CCE determined the work schedule. Defendant CCE's foreman had authority to, and did in fact, set the employees' required hours.

25.     Because Defendant CCE required certain hours, Defendants CCS and Ixel Morales in turn required employees to work from 7a.m. to 5p.m., Monday through Thursday, and from 7a.m. to 3p.m. on Fridays and Saturdays. Generally, Defendant Ixel Morales advised employees of their hours.

26.     Raw materials were provided to employees at the worksite by Defendant CCE. Defendant CCE also provided ladders and tools for cutting metal.

27.     Defendant CCS, through Defendant Ixel Morales, agreed to pay Plaintiffs at an hourly rate, irrespective of the cost, success, or failure of the project. The rate of pay for each Plaintiff was determined by Defendant Ixel Morales upon hire.

28.     Defendants CCS, through Defendants Ixel Morales and Keren Torres, would pay employees regularly, usually in cash. Although the Plaintiffs never actually agreed to this, Defendants Morales and Torres kept about 2% of each payment to cover the cost of "cashing the check." On a few occasions, when some Plaintiffs requested to be paid by check to avoid the 2% charge, Defendant Ixel Morales refused, sometimes while displaying a firearm on his desk. None of the Plaintiffs freely and voluntarily consented to this 2% deduction.

29.     Employees would meet Defendant Ixel Morales to pick up their pay at his car shop, TMT Auto (located at 5750 General Washington Drive, Suites F and G, Alexandria, VA 22312), or at his home in Alexandria, VA.

30.     Defendant Keren Torres regularly distributed to Plaintiffs their payments. For each employee being paid, Defendant Keren Torres noted the name of the employee and the amount they were paid prior to handing the payment to that employee. Upon information and belief, Defendant Keren Torres is the only individual with a record of payments made by Defendant CCS to its employees. Upon information and belief, Defendant Keren Torres is the individual who was responsible for calculating how much pay would be given to each employee, based on multiplying their hourly rate by the number of hours that they had worked in a pay period; as such, she is the individual who had the personal responsibility to correctly calculate the Plaintiffs' overtime premiums, but failed to do so. Upon information and belief, she had knowledge that they were working overtime but not getting paid overtime, and she had the ability to pay them their overtime premiums, but she did not do so.

31.     When, after the end of their employment, some of the Plaintiffs complained to Defendant Ixel Morales that they had not yet received their pay, Defendant Ixel Morales responded that he had not yet received any payment from Defendant CCE.

**Plaintiffs' Employment by Defendants**

*Manuel Rodriguez Hernandez*

32.     Plaintiff Manuel Rodriguez Hernandez worked for Defendant CCS from early-March to July 5, 2016. Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Rodriguez estimates that he began working for Defendants on March 5, 2016. Mr. Rodriguez's role was to lay sheetrock and finish drywall for Defendant.

33.     Defendant Ixel Morales told Mr. Rodriguez that he would be paid $18 per hour.

34.     At first, Defendant Ixel Morales paid Mr. Rodriguez on time; however, the
payment was only for 56 hours per week, and only at the regular rate of $18 per hour. Mr.
Rodriguez's pay did not apply the overtime rate for the 16 overtime hours he worked each week.

35.     For Mr. Rodriguez's work from March 5 to June 25, 2016, Mr. Rodriguez earned
approximately $16,128 ($18 multiplied by 56 hours per week for 16 weeks). However, he should
have earned $18,432 ($18 per hour for 40 regular hours per week, plus $27 per hour for 16
overtime hours per week, multiplied by 16 weeks). Therefore, Mr. Rodriguez is owed the
difference of $2304.

36.     By June 2016, Defendant was no longer making timely payments. From June 25
to July 5, Mr. Rodriguez worked a total of nine days without pay. For June 25, Mr. Rodriguez is
owed $144 (eight hours at the regular rate of $18 per hour). For the week of June 27 to July 2,
Mr. Rodriguez is owed $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the
overtime rate of $27 per hour). For July 4 and 5, Mr. Rodriguez is owed $360 (20 hours at the
regular rate of $18 per hour). This comes to $1656.

37.     For all of his unpaid and incorrectly paid work from March 5 to July 5, 2016, Mr.
Rodriguez is owed a total of $3960. By the time Mr. Rodriguez left Defendant CCS in July,
Defendants had paid Mr. Rodriguez $600 toward that balance, meaning that, when he left
Defendant CCS, Mr. Rodriguez was owed at least $3360. To date, he has not received any of this
pay.

### *Juan Rodas*

38.     Plaintiff Juan Rodas met with Defendant Ixel Morales after learning that
Defendant Ixel Morales was looking for workers. Defendant Ixel Morales employed Mr. Rodas
from approximately February 29 to August 9, 2016.

39.     Defendant Ixel Morales determined that, like the other employees who worked with sheetrock, Mr. Rodas would be paid $18 per hour.

40.     For Mr. Rodas's work from February 29 to July 15, 2016, Mr. Rodas earned approximately $19,152 ($18 multiplied by 56 hours per week for 19 weeks). However, he should have earned $21,888 ($18 per hour for 40 regular hours per week, plus $27 per hour for 16 overtime hours per week, multiplied by 19 weeks). Therefore, Mr. Rodas is owed the difference of $2736.

41.     Though he is unsure of the exact dates and hours of his employment and does not have access to records, Mr. Rodas estimates that from July 15 to August 9, 2016, he worked three weeks without pay. When he asked Defendant Ixel Morales about the unpaid wages, Defendant Ixel Morales agreed to pay if Mr. Rodas would help for one day at another worksite in Arlington. (Though Mr. Rodas does not recall the address of the other worksite, he did not work with Defendant CCE.) Mr. Rodas agreed and performed 10 hours of labor, for which Defendant Ixel Morales also failed to pay him. In total, he is owed $3636 (130 hours at the regular rate of $18 per hour, plus 48 hours at the overtime rate of $27 per hour).

42.     In total, Mr. Rodas is owed at least $6372. To date, he has not received any of this pay.

### *Juan Flores Lopez*

43.     Plaintiff Juan Flores Lopez worked for Defendant from approximately March to August 2016. His role was to frame and lay sheet rock at the worksite at 1720 S. Eads Street in Arlington, VA. Mr. Flores cannot recall exactly when was he began his employment, but he estimates that his first day of work was in March 2016.

44.     Defendant Ixel Morales told Mr. Flores he would be paid $18 per hour.

45.     Though he is unsure of the exact dates and hours he worked and does not have access to records, Mr. Flores estimates that, from July 15 to August 9, 2016, he worked 17 days without pay. In total, he is owed $5256 (196 hours at the regular rate of $18 per hour, plus 64 hours at the overtime rate of $27 per hour).

46.     In total, Mr. Flores is owed at least $5256. To date, he has not received any of this pay.

### Bernardo Martinez

47.     Plaintiff Bernardo Martinez was recruited by a friend to work for Defendant. Mr. Martinez came to the worksite at 1720 S. Eads St. in Arlington, VA to meet with Defendant Ixel Morales. Defendant Ixel Morales gave the final approval for Mr. Martinez's employment.

48.     Though he is unsure of the exact dates and hours of his employment and does not have access to records, Mr. Martinez estimates that he was Defendants' employee from July 15 to August 5, 2016, and that his normal schedule was 7a.m. to 3p.m., Monday through Friday.

49.     Defendant Ixel Morales determined that, for his skill, Mr. Martinez would be paid $17 per hour.

50.     Though he is unsure of the exact dates and hours he worked and does not have access to records, Mr. Martinez estimates that he worked 15 days without pay. Based on his usual schedule of 40 hours a week, Mr. Martinez estimates he is owed $2040 (120 hours multiplied by the regular rate of $17 per hour).

51.     In total, Mr. Martinez is owed at least $2686. To date, he has not received any of this pay.

### Jose Rivera

52.     Plaintiff Jose Rivera was recruited by his brother to work for Defendants. Mr. Rivera's brother arranged the job, and Defendant Ixel Morales gave the final word that Mr. Rivera would be employed by Defendant CCS to do drywall and metal framing starting June 2016. Mr. Rivera worked for Defendants until August 2016.

53.     Defendant Ixel Morales told Mr. Rivera he (Mr. Rivera) would be paid $16 per hour.

54.     Defendant Ixel Morales instructed Mr. Rivera via text message what his hours would be, the address of the worksite, and the name and number of the foreman.

55.     Mr. Rivera worked eight hours a day, Monday through Friday, as well as two Saturdays.

56.     When Defendant Ixel Morales failed to pay Mr. Rivera, Mr. Rivera asked Defendant Ixel Morales to assign him to another worksite. When Defendant Ixel Morales refused, Mr. Rivera ceased to work for Defendants.

57.     Though he is unsure of the exact dates of nonpayment and does not have access to records, Mr. Rivera estimates that, over the course of Mr. Rivera's employment, he worked 14 days without pay. Based on his usual schedule of 40 hours per week, Mr. Rivera estimates he is owed $1792 (112 hours at the regular rate of $16 per hour).

### Pedro Orellana

58.     Plaintiff Pedro Orellana was employed by Defendants from approximately May through July 2016.

59.     Mr. Orellana and Defendant Ixel Morales agreed that Mr. Orellana would be paid $18 per hour.

60.     Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Orellana estimates that he worked for Defendants for 53 days (from May 1 to July 1). Mr. Orellana estimates that, for 44 days, he was paid about $7920 (440 hours at the regular rate of $18 per hour, multiplied by 44 days). Based on his usual weekly schedule, Mr. Orellana estimates he is owed $9000 (320 hours at the regular rate of $18 per hour, plus 120 hours at the overtime rate of $27 per hour). Thus, Mr. Orellana is owed the difference of $1080.

61.     Additionally, Mr. Orellana worked 9 days without pay for a total 86 hours of work. Though he does not have access to his employment records, Mr. Orellana estimates that, based on his usual schedule, he is owed $1692 for those 9 days (70 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour).

62.     In total, Mr. Orellana is owed at least $2772. To date, Mr. Orellana has only been paid $400. Defendant still owes Mr. Orellana $2372.

### *Jose Benitez*

63.     Plaintiff Jose Benitez was recruited by a friend, Plaintiff Juan Flores, to work for Defendants. Mr. Benitez came to the worksite at 1720 S. Eads St. in Arlington, VA to meet with Defendant Ixel Morales. Defendant Ixel Morales gave the final approval for Mr. Benitez's employment.

64.     Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Benitez estimates that he worked for Defendants from April 1, 2016 to August 9, 2016.

65.     After discussing, Mr. Benitez and Defendant Ixel Morales agreed that Mr. Benitez would be paid $16 per hour.

12

66. From July to August 2016, Mr. Benitez estimates that he worked 17 days without pay. Based on his usual schedule of 56 hours per week, Mr. Benitez estimates he is owed $2880 (120 hours at the regular rate of $16 per hour, plus 40 hours at the overtime rate of $24 per hour).

67. In total, Mr. Benitez is owed at least $3148.80. To date, he has not received any of this pay.

### *Jaime Alarcon Aguilar*

68. Plaintiff Jaime Alarcon Aguilar was employed by Defendant from May 16 to July 3, 2016.

69. Defendants' representative, Jose (whose last name is unknown to Mr. Alarcon but who was known among Plaintiffs by the nickname "Gallo"), determined that Mr. Alarcon would be paid $18 per hour.

70. Though he is unsure of the exact hours he worked or payment he received, and does not have access to records, Mr. Alarcon estimates that from May 16 to June 27, Mr. Alarcon was paid about $1008 per week (56 hours at the regular rate of $18 per hour). For each week, he should have been paid $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour). Thus, for overtime hours he worked each of those 6 weeks, Mr. Alarcon is owed the difference of $144, for a total of $864.

71. From June 27 to July 2, 2016, Mr. Alarcon worked 56 unpaid hours for which he is owed $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour).

72. Mr. Alarcon is owed a total of $2016. To date, he has not received any of this pay.

### William Orellana

73.    Plaintiff William Orellana was recruited by a friend, Plaintiff Marcos Flores, to work for Defendants. After discussing with Defendant Ixel Morales, Mr. Orellana became Defendants' employee from the end of February to August 8, 2016.

74.    Defendant Ixel Morales told Mr. Orellana that he (Mr. Orellana) would be paid $16 per hour.

75.    Though he is unsure of the exact hours he worked and does not have access to records, Mr. Orellana estimates that he worked on ten Saturdays without pay.

76.    For the ten Saturdays Mr. Orellana worked, he was paid about $1280 (eight hours on each of ten days, at the regular rate of $18 per hour). Because Mr. Orellana's usual hours from Monday to Friday add up to 48, additional Saturday hours are always overtime hours, and should have been paid at the overtime rate. Thus, he should have been paid $2160 (80 hours at the overtime rate of $27 per hour). Therefore, Mr. Orellana is owed the difference of $880.

77.    Over the course of his employment, Mr. Orellana estimates that he worked 120 hours without pay. Based on his usual schedule of 56 hours per week, Mr. Orellana estimates he is owed $2448 (88 hours at the regular rate of $18 per hour, plus 32 hours at the overtime rate of $27 per hour).

78.    In total, Mr. Orellana is owed at least $3328. To date, he has not received any of this pay.

### Marcos Flores

79.    Plaintiff Marcos Flores was recruited by a friend to work for Defendants in framing and drywall. After a phone call with Defendant Ixel Morales, Defendant Ixel Morales

14

gave his approval and Mr. Flores was employed by Defendants in the beginning of February 2016.

80.     Defendant Ixel Morales told Mr. Flores he (Mr. Flores) would be paid $18 per hour and gave him the address of the worksite.

81.     On August 7, 2016, after Defendants had repeatedly failed to pay Mr. Flores, Mr. Flores stopped working for Defendants.

82.     Though he is unsure of the exact hours he worked and does not have access to records, Mr. Flores estimates that he worked three weeks unpaid. Based on his usual schedule, Mr. Flores estimates he is owed $3456 (120 hours at the regular rate of $18 per hour, plus 48 hours at the overtime rate of $27 per hour).

83.     In total, Mr. Flores is owed at least $3456. To date, he has not received any of this pay.

### Carlos Molina

84.     Plaintiff Carlos Molina approached Defendant Ixel Morales for a position in Spring 2016. After discussing with Defendant Ixel Morales, Mr. Molina was hired to work for Defendants starting approximately April 25, 2016.

85.     Based on what he paid other employees for finishing and drywall, Defendant Ixel Morales determined that Mr. Molina would be paid $18 per hour.

86.     Though he is unsure of the exact hours he worked and does not have access to records, Mr. Molina estimates that he worked from approximately April 25 to approximately July 20. In that time, Mr. Molina was paid about $720 per week (40 hours per week at the regular rate of $18 per hour). This comes to $8640 over 12 weeks. For each week, he should have been paid $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27

per hour). This comes to $13,824 over 12 weeks. Thus, for overtime hours he worked throughout those 12 weeks, Mr. Molina is owed the difference of $5184.

87.     On July 20, 2016, after Defendants had repeatedly failed to pay him, Mr. Molina stopped working for Defendant.

88.     Mr. Molina estimates that he worked about 9 unpaid days for Defendants. Based on his usual schedule of 56 hours per week, Mr. Molina estimates he is owed $1692 (70 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour).

89.     In total, Mr. Molina is owed at least $7048.80. To date, he has not received any of this pay.

### *Vladimir Condori*

90.     Plaintiff Vladimir Condori was referred to Defendants by a friend. After a phone conversation, Defendant Ixel Morales agreed to hire Mr. Condori. Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Condori estimates that he began working for Defendants around April 1, 2016 and ceased working for them around September 1, 2016.

91.     Defendant Ixel Morales offered to pay Mr. Condori $19 per hour, and Mr. Condori accepted.

92.     Defendants paid Mr. Condori for approximately 19 weeks before failing to pay the last two weeks of August. During the months Mr. Condori was paid, he received the regular rate of $19 per hour. This comes to $20,216. To account for overtime hours worked during those four months, Mr. Condori should have been paid $23,104 (40 hours per week at the regular rate of $19 per hour, plus 16 hours per week at the overtime rate of $28.50 per hour, multiplied by 19 weeks). Therefore, Mr. Condori is entitled to the difference of $2888.

16

93.     Though he is unsure of the exact hours he worked and does not have access to

records, Mr. Condori estimates that he worked two weeks without pay. For his regular hours, Mr.

Condori is owed $2432 (80 hours at the regular rate of $19 per hour, plus 32 hours at the

overtime rate of $28.50 per hour).

94.     In total, Mr. Condori is owed at least $5320.To date, he has not received any of

this pay.

### *Jhom Montano*

95.     Plaintiff Jhom Montano had previously worked with Defendants to work on other

projects, and had been properly paid in the past.

96.     Though he is unsure of the exact dates of his employment and does not have

access to records, Mr. Montano estimates that Defendants assigned him to the 1720 S. Eads

project around April 1, 2016 and that he ceased working for Defendants around September 1,

2016.

97.     Mr. Montano and Defendant Ixel Morales had discussed and agreed that Mr.

Montano would be paid $19 per hour.

98.     For the 22 Saturdays he worked eight hours each, Mr. Montano was paid at the

regular rate of $19 per hour. This comes to an estimated total of $3344 paid to Mr. Montano.

Based on his usual schedule of 10 hours a day Monday through Friday, hours worked on

Saturday would exceed regular time and should have been paid at the overtime rate of $28.50 per

hour. Thus, for the 22 Saturdays Mr. Montano worked, he should have been paid $5016.

Therefore, Mr. Montano is owed the difference of $1672.

99.     Toward the end of his employment with Defendants, Mr. Montano estimates he

worked two weeks unpaid. Based on his regular schedule of 56 hours per week, Mr. Montano

17

estimates he worked 80 hours regular time, and 32 hours overtime. Therefore, he is owed $2432

(80 hours at the regular rate of $19 per hour, and 32 hours at the overtime rate of $28.50 per

hour).

100.    In total, Mr. Montano is owed at least $4104. To date, he has not received any of

this pay.

## FAIR LABOR STANDARDS ACT CLAIMS

101.    At all times relevant to this action:

      a.    Plaintiffs were Defendants' "employees" within the meaning of 29 U.S.C.

          § 203(e)(1);

      b.    Defendants were Plaintiffs' "employers" within the meaning of 29 U.S.C.

          § 203(d);

      c.    Defendants "employed" Plaintiffs within the meaning of 29 U.S.C. §

          203(g); and

      d.    Plaintiffs were engaged in commerce, or were employed by Defendants in

          an enterprise engaged in commerce, within the meaning of 29 U.S.C. §

          203(b).

### Count 1:
### Failure to Pay Minimum Wages, 29 U.S.C. § 2016

102.    Defendants were required to pay Plaintiffs at least $7.25 for each hour they

worked.

103.    As set forth above, Defendants repeatedly failed to pay Plaintiffs any wages at all

at various times over the course of Plaintiffs' employment, to Plaintiffs' injury, and are thus

jointly and severally liable to Plaintiffs for damages.

## Count 2:
### Failure to Pay Overtime Wages, 29 U.S.C. § 207 (Plaintiffs Manuel Rodriguez Hernandez, Juan Rodas, Juan Flores Lopez, Pedro Orellana, Jose Benitez, Jaime Alarcon Aguilar, William Orellana, Carlos Molina, Vladimir Condori and Jhom Montano only)

104. Defendants were required to pay Plaintiffs one-and-a-half times their regular rate of pay for each hour they worked beyond 40 hours in any given week.

105. As set forth above, Defendants failed to pay Plaintiffs Manuel Rodriguez Hernandez, Juan Rodas, Juan Flores Lopez, Pedro Orellana, Jose Benitez, Jaime Alarcon Aguilar, William Orellana, Carlos Molina, Vladimir Condori and Jhom Montano for the overtime hours they worked in 2016, thus violating the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 207, to those Plaintiffs' injury, and are thus jointly and severally liable to those Plaintiffs in damages. Indeed, Defendants never paid Plaintiffs any overtime premiums at all.

106. In addition, by deducting 2% of the Plaintiffs' promised wage without the consent of the Plaintiffs, defendants failed to pay Plaintiffs their properly calculated overtime premium for those weeks in which the Plaintiffs worked overtime, thus violating the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 207, to those Plaintiffs' injury, and are thus jointly and severally liable to those Plaintiffs in damages.

## VIRGINIA STATE LAW CLAIMS

## Count 3:
### Breach of Contract (Defendant Capital Commercial Solutions, LLC only)

107. Each Plaintiff reached an agreement with Defendant Capital Commercial Solutions, LLC whereby Defendant Capital Commercial Solutions, LLC would pay that Plaintiff a certain hourly wage in exchange for that Plaintiff's performing construction work for

Defendant Capital Commercial Solutions, LLC. Employment contracts were thus formed under Virginia law.

108. Defendant Capital Commercial Solutions, LLC failed to pay Plaintiffs for all the hours they worked, thus breaching its contract with Plaintiffs.

109. In addition, by deducting 2% of the Plaintiffs' promised wage without the consent of the Plaintiffs, Defendant Capital Commercial Solutions, LLC failed to pay Plaintiffs their entire wage as promised, thus breaching its contract with Plaintiffs.

110. As a result of Defendant's breaches, Plaintiffs have suffered damages.

### Count 4:
### Conversion (Defendants Capital Commercial Solutions, LLC and Ixel Morales only)

111. By taking from the Plaintiffs 2% of all money they earned in the form of a purported "check cashing fee" to which the Plaintiffs did not consent and from which the Plaintiffs did not have the right to opt out, Defendants Capital Commercial Solutions, LLC and Ixel Morales did wrongfully and without consent convert the Plaintiffs' money to their own property, and are thus jointly and severally liable to the Plaintiffs for conversion. Defendants Capital Commercial Solutions, LLC and Ixel Morales did this willfully and wantonly, with conscious disregard of the rights of the Plaintiffs.

### RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that the Court provide the following relief:

1. Award each Plaintiff his actual damages under FLSA in the amount of all unpaid minimum and overtime wages as set forth above, jointly and severally against all Defendants, in an amount to be proved at trial;

2.     Award each Plaintiff an additional amount of liquidated damages equal to his actual damages, pursuant to 29 U.S.C. § 216(b), jointly and severally against all Defendants;

3.     Award Plaintiffs their costs and reasonable attorney's fees, as provided by 29 U.S.C. § 216(b), jointly and severally against all Defendants;

4.     Award Plaintiffs their contract damages under Virginia law, in an amount to be proved at trial, against Defendant Capital Commercial Solutions, LLC only, as well as prejudgment interest of six percent from the date of breach;

5.     Award Plaintiffs a judgment for the total amount of money taken from them in the form of unlawful and non-consensual "check cashing fees" by Defendants Capital Commercial Solutions, LLC and Ixel Morales, under a conversion cause of action, in an amount to be proved at trial, jointly and severally against those two defendants, as well as prejudgment interest of six percent from the date of breach;

6.     Award Plaintiffs punitive damages on their conversion cause of action, in an amount to be proved at trial and in the discretion of the jury, jointly and severally against Defendants Capital Commercial Solutions, LLC and Ixel Morales; and

7.     Grant any other relief the Court deems just and proper.

Plaintiffs demand trial by jury.


Respectfully submitted,

By: _____          Date: 1/25/2017
Simon Sandoval-Moshenberg (VSB No. 77110)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike #520
Falls Church, Virginia 22041
(703) 720-5605 / Fax: (703) 778-3454
simon@justice4all.org
*Counsel for the Plaintiffs*

21