**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

| | | |
|---|---|---|
| MANUEL RODRIGUEZ, JUAN RODAS, JUAN FLORES LOPEZ, BERNARDO MARTINEZ, JOSE RIVERA, PEDRO ORELLANA, JOSE BENITEZ, JAIME ALARCON AGUILAR, WILLIAM ORELLANA, MARCOS FLORES, CARLOS MOLINA, VLADIMIR CONDORI, JHOM MONTANO, KENNY BARRIANTOS, INDIRA BARRIANTOS, HUGO BERMUDEZ, SANDRA BONILLA, CESAR DURAN, HERMES MARULANDA, and RUTH MONJE | ) ) ) ) ) ) ) ) ) ) ) | Civ. No.: 1:17-cv-00112-TSE-JFA |
| | ) | Collective Action Complaint |
| ***On Behalf of Themselves and All Others Similarly Situated*** | ) ) ) | JURY TRIAL REQUESTED |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | |
| CAPITAL COMMERCIAL SOLUTIONS, LLC, Serve: Ixel R. Morales, R/A 6300 Lincolnia Road Alexandria, VA 22312 | ) ) ) ) ) ) | |
| IXEL R. MORALES, | ) ) | |
| KEREN TORRES, | ) ) | |
| *and* | ) ) | |
| CCE SPECIALTIES, LLC, Serve: CT Corporation System, R/A 4701 Cox Road, Suite 285 Glen Allen, VA 23060 | ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**COLLECTIVE ACTION AMENDED COMPLAINT**

**Preliminary Statement**

1.      Plaintiffs Jamie Alarcon Aguilar ("Mr. Aguilar"),  Indira Barriantos ("Ms. Barriantos"), Kenny Barriantos ("Mr. Barriantos"), Jose Benitez ("Mr. Benitez"), Hugo Bermudez ("Mr. Bermudez"), Sandra Bonilla ("Ms. Bonilla"), Vladimir Condori ("Mr. Condori"), Cesar Flores Duran ("Mr. Duran"), Marcos Flores ("Mr. Flores"), Juan Flores Lopez ("Mr. Lopez"), Bernardo Martinez ("Mr. Martinez"), Hermes Marulanda ("Mr. Marulanda"), Carlos Molina ("Mr. Molina"), Ruth Monje ("Ms. Monje"), Johm Montano ("Mr. Montano"), Pedro Orellana ("Mr. P. Orellana"), William Orellana ("Mr. W. Orellana"), Jose Rivera ("Mr. Rivera"), Juan Rodas ("Mr. Rodas"), and Manuel Rodriguez Hernandez ("Mr. Rodriguez") (collectively, "Plaintiffs"), by and through undersigned counsel, on behalf of themselves and all others similarly situated, bring this Collective Action Complaint against defendant Capital Commercial Solutions, LLC ("CCS"), Ixel R. Morales ("Mr. Morales"), Keren Torres ("Ms. Torres"), and CCE Specialties, LLC ("CCE") (together, "Defendants"), to recover unpaid wages, unpaid overtime, liquidated damages, reasonable attorney's fees, costs, and other relief as appropriate under: Section 16(b) of the Federal Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq. ("the FLSA") and Virginia common law.

2.      Plaintiffs' claims arise from Defendants' failure to pay minimum and overtime wages as required by the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 ("FLSA").

3.      The Court has subject matter jurisdiction over the FLSA claims pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331. The court has subject matter jurisdiction over the state law breach of contract claim and conversion claim because they are so closely related to the federal law claims as to form part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

4. Because Defendants are domiciled in, and do business in, Virginia, the Court has personal jurisdiction over Defendants.

5. Venue is proper in the Alexandria Division of the Eastern District of Virginia because the events or omissions giving rise to Plaintiffs' claims occurred in Arlington, Virginia. *See* U.S.C. § 1391(b)(2).

## PARTIES AND JURISDICTION

6. Except for Plaintiffs Kenny Barriantos, Indira Barriantos, Sandra Bonilla, Cesar Duran, Hermes Marulanda, Ruthe Monje, and Jose Rivera, Plaintiffs are adult residents of Fairfax County, Virginia. Plaintiff Kenny Barriantos is an adult resident of Arlington County, Virginia. Plaintiffs Cesar Duran, Hermes Marulanda, Ruthe Monje, and Jose Rivera are adult residents of Prince George's County, Maryland. Plaintiff Indira Barriantos is an adult resident of Harford County, Maryland. Plaintiff Sandra Bonilla is an adult resident of Montgomery County, Maryland. All Plaintiffs performed a variety of specialized tasks for Defendants' construction business in Virginia.

7. Defendant Capital Commercial Solutions, LLC ("CCS") is a Virginia corporation. Its registered office is located at 6300 Lincolnia Road, Alexandria, VA 22312. Defendant CCS employs workers to perform construction duties on various projects in Virginia and in Washington, D.C. At all times relevant to this action, Defendant CCS employed Plaintiffs to perform construction work.

8. Defendant Ixel Morales is an adult resident of Fairfax County as well as member and manager of Defendant CCS. Defendant Ixel Morales approved Plaintiffs as employees, arranged work for them, determined the appropriate rate of pay for each role, and purported to pay Plaintiffs. Upon information and belief, he is the husband of Defendant Keren Torres.

9.     Defendant Keren Torres is an adult resident of Fairfax County. Upon information and belief, Defendant Keren Torres exercised a position of trust and authority with Defendant CCS. Defendant Keren Torres distributed payments to employees. She also kept records of which employees had received payment, and in what amount.  Upon information and belief, she is the wife of Defendant Ixel Morales.

10.    Defendant CCE Specialties, LLC ("CCE") is a Maryland limited liability company registered to do business in Virginia, with a registered agent in Glen Allen, VA. Defendant CCE employs workers to perform construction duties on various projects in Virginia and in Washington, D.C. At all times relevant to this action, Defendant CCE employed Plaintiffs to perform construction work.

## COLLECTIVE ACTION COMPLAINT

11.    This action is brought as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b) by Plaintiffs, on behalf of themselves and all other employees similarly situated, based on employment with Defendants as non-exempt, hourly-paid or salaried employees between February 1, 2016 and September 1, 2016 (the "Class Period"), to recover lost wages, overtime compensation, liquidated damages, interest, attorneys' fees, costs, and all other relief as appropriate for Defendants' willful statutory violations.

### FACTS
### Defendant CCE Specialties, LLC's Status as Employer

12.    Defendant CCE is a construction company specializing in Cold-Form Metal Framing, Engineered Trusses, Specialty Drywall and Acoustical Ceiling for major residential and commercial construction projects, including but not limited to building secure facilities abroad for the U.S. government.  CCE often prefers not to employ construction workers directly, but rather uses various staffing agencies to provide labor for its construction projects in the

Washington, D.C. metro area.  *See, e.g.*, *Edwin Mendoza-Lopez, et al. v. John Moriarty & Associates, et al.*, 1:16-cv-02341-CRC (D.D.C., complaint filed Nov. 28, 2016) (alleging that CCE, through an intermediary staffing agency, violated the FLSA and DC minimum wage laws).

13.     The use of staffing companies, also known as labor brokers, is an increasingly common means for construction subcontractors to attempt to undercut their competitors' prices by avoiding compliance with workers' rights statutes such as the FLSA.[1]

14.     Upon information and belief, at all relevant times, Defendant CCE had an annual gross income volume of business of over $500,000, and at least two employees who are engaged in interstate commerce or who handle, sell, or otherwise work on goods or materials that have moved in interstate commerce.

15.     Upon information and belief, in early 2016, Defendant CCS was contracted by Defendant CCE to hire workers to perform construction duties on a brand-new luxury apartment building being erected at 1720 S. Eads Street, Arlington, VA 22202.  Defendant CCS then selected and hired all the Plaintiffs to work at the construction site.

---

[1] *See, e.g.*, U.S. Department of Labor, Wage and Hour Division, Administrator's Interpretation No. 2016-1, *Joint employment under the Fair Labor Standards Act and Migrant and Seasonal Agricultural Worker Protection Act* , available at https://www.dol.gov/whd/flsa/Joint_Employment_AI.pdf ("More and more, businesses are varying organizational and staffing models by, for instance, sharing employees or using third party management companies, independent contractors, staffing agencies, or labor providers. As a result, the traditional employment relationship of one employer employing one employee is less prevalent."); National Employment Law Project report, *Who's the Boss: Restoring Accountability for Labor Standards in Outsourced Work* (May 2014), *available at* http://www.nelp.org/content/uploads/2015/02/Whos-the-Boss-Restoring-Accountability-Labor-Standards-Outsourced-Work-Report.pdf ("Business outsourcing is on the rise, through practices such as multi-layered contracting, use of staffing or temp firms, franchising, misclassifying employees as independent contractors, and other means . . . .  Lead companies that outsource distance themselves from the labor-intensive parts of their businesses and their responsibilities for those workers."); The Washington Post, "*Department of Labor sends warning shot to clients of temp staffing agencies*" (January 20, 2016), available at https://www.washingtonpost.com/news/wonk/wp/2016/01/20/department-of-labor-sends-warning-shot-to-clients-of-temp-staffing-agencies/?utm_term=.243bbbf53369 ("Subcontracting, outsourcing, and the use of staffing agencies allows businesses to inexpensively scale up and scale down their labor needs, without the extra hassle and liability of adding payroll. But it also adds another layer between workers and the bosses who call the shots, shielding managers from responsibility when the labor provider doesn't follow the law.").

16.     Defendant CCE provided a foreman, Francisco (whose last name is unknown to Plaintiffs), to supervise the worksite. Upon information and belief, Francisco is an employee of Defendant CCE.

17.     Plaintiffs signed-in with the foreman Francisco at the start of each workday. Upon information and belief, Francisco kept a record of Plaintiffs' hours. Plaintiffs, trusting that the foreman would keep accurate records, kept only intermittent records of their own hours. The dates and times stated by Plaintiffs in this Complaint are based on Plaintiffs' best memory and limited records of the time they worked for Defendants.

18.     The foreman Francisco gave Plaintiffs their assigned daily tasks at the start of the day. Throughout the day, Francisco would move through the worksite, observing the work of the employees and correcting them if they were not doing the work to CCE's standards.

19.     The foreman Francisco had authority to fire employees whose performance was unsatisfactory, for example, if the employee spent too much time talking on the phone or showed poor workmanship.

**Defendant Capital Commercial Solutions, LLC Generally**

20.     Defendant CCS operates as a staffing agency or labor broker, employing individuals to perform work on construction projects for other companies. Upon information and belief, Defendant CCS does not operate its own construction sites, but only staffs other companies' construction sites.  Defendant CCS assigns the employees to work at various sites with different companies.

21.     Upon information and belief, at all relevant times, Defendant CCS had an annual gross income volume of business of over $500,000 and at least two employees who are engaged in interstate commerce or who handle, sell, or otherwise work on goods or materials that have moved in interstate commerce.

22.     Employees were generally recruited by word-of-mouth, but Defendant Ixel Morales had the final say in whether an employee was hired to work for Defendant CCS.

23.     Plaintiffs were employed by Defendants to work at the 1720 S. Eads Street, Arlington, VA 22202 worksite.

24.     Defendant Ixel Morales determined Plaintiffs' rate of pay.

25.     Defendant CCE determined the work schedule. Defendant CCE's foreman had authority to, and did in fact, set the employees' required hours.

26.     Because Defendant CCE required certain hours, Defendants CCS and Ixel Morales implemented CCE's requirements by requiring employees to work from 7 a.m. to 5 p.m., Monday through Thursday, and from 7 a.m. to 3 p.m. on Fridays and Saturdays. Although Plaintiffs worked approximately 58 hours each week, they were never once paid overtime rates for their work.

27.     Raw materials were provided to employees at the worksite by Defendant CCE. Defendant CCE also provided ladders and tools for cutting metal.

28.     Defendant CCS, through Defendant Ixel Morales, agreed to pay Plaintiffs at an hourly rate, irrespective of the cost, success, or failure of the project. The rate of pay for each Plaintiff was determined by Defendant Ixel Morales upon hire.

29.     Defendants CCS, through Defendants Ixel Morales and Keren Torres, would pay employees regularly, usually in cash. Although the Plaintiffs never actually agreed to this, Defendants Morales and Torres kept about 2% of each payment to cover the cost of "cashing the check." On a few occasions, when some Plaintiffs requested to be paid by check to avoid the 2% charge, Defendant Ixel Morales refused, sometimes while displaying a firearm on his desk. None of the Plaintiffs freely and voluntarily consented to this 2% deduction.

30.	Employees would meet Defendant Ixel Morales to pick up their pay at his auto body shop, TMT Autobody and Restoration, LLC (located at 5750 General Washington Drive, Suites F and G, Alexandria, VA 22312), or at his home in Alexandria, VA.

31.	Defendant Keren Torres regularly distributed payment to Plaintiffs. For each employee being paid, Defendant Keren Torres recorded the name of the employee and the amount they were paid prior to handing the payment to that employee. Upon information and belief, Defendant Keren Torres is the only individual with a record of payments made by Defendant CCS to its employees.  Upon information and belief, Defendant Keren Torres is the individual who was responsible for calculating how much pay would be given to each employee, based on multiplying their hourly rate by the number of hours that they had worked in a pay period; as such, she is the individual who had the personal responsibility to correctly calculate the Plaintiffs' overtime premiums, but failed to do so.  Upon information and belief, she had knowledge that they were working overtime but not getting paid overtime, and she had the ability to pay them their overtime premiums but did not do so.

32.	On multiple occasions, Defendants Ixel Morales and Keren Torres made Plaintiffs Indira Barriantos, Kenny Barriantos, Hugo Bermudez, Sandra Bonilla, Cesar Duran, Hermes Marulanda, and Ruth Monje and other employees wait outside of their house or TMT Autobody and Restoration, LLC to receive payment, telling the employees that Ms. Torres had gone to the bank to withdraw cash so she could pay their wages.  Plaintiffs were routinely made to wait at these locations for hours before being told that they would not be paid because the bank had closed or because CCE's check had not been processed by the bank. Plaintiffs asked Defendant Ixel Morales and Defendant Keren Torres when they would be paid and were told to return on a

subsequent date, whereby the process was repeated.  Defendant Ixel Morales told Plaintiffs to seek other employment if they were unhappy with not being paid.

33.     After Defendant Ixel Morales refused to pay employees, multiple employees, including Plaintiffs Cesar Duran, Kenny Barriantos, Indira Barriantos, and Sandra Bonilla, notified Defendant Ixel Morales that they would not be returning to the jobsite until they were paid for wages due.  Defendant Ixel Morales induced them to continue working by repeating again his false promise of payment in the future.

34.     Defendant Ixel Morales also insulted and demeaned Plaintiffs and other employees who approached him to inquire about receiving payment for work they had performed, and discouraged employees from seeking legal advice regarding his failure to pay wages.  Defendant Ixel Morales questioned employees about their need for payment, insisted they were being greedy, and attempted to pay less than the full amount of wages that he had agreed after the work had been performed.

35.     For example, in or around July of 2016, Plaintiff Sandra Bonilla was forced to wait hours outside of Defendant Ixel Morales' house for Defendant Keren Torres to return with funds to pay three weeks of unpaid wages.  When Defendant Ixel Morales finally appeared to tell Ms. Bonilla and others that there would be no payments that afternoon, Ms. Bonilla, understandably upset, confronted Defendant Ixel Morales over the unpaid wages.  She reminded him that she had two children to feed and that her rent was due that week.  Defendant Ixel Morales responded by telling Ms. Bonilla that she did not really need the money because her children were in El Salvador and that he would give her $100 to pay for her children's food.  Ms. Bonilla said she would accept nothing less than the full amount of wages due to her, to which

Defendant Ixel Morales responded that her children must be fat and spoiled to require so much money for food.

36.     Defendant Ixel Morales similarly subjected other employees who sought payment to verbal abuse and harassment.  In late June of 2016, after waiting outside of TMT Autobody for payment which never arrived, Plaintiffs Kenny and Indira Barriantos approached Defendant Ixel Morales to request that he notify them next time he could pay so that they would not have to travel to his house or TMT Autobody and waste time awaiting payment.  Defendant Ixel Morales called Kenny and Indira Barriantos "greedy," and told them that their time was not important to him and that if they were unhappy with their treatment they should find employment elsewhere. Mr. and Ms. Barriantos replied that they would happily do so once they had been paid in full for wages due.  Defendant Ixel Morales replied that the only way Mr. and Ms. Barriantos would be paid was if they continued to work on the project through its completion.

37.     Defendant Ixel Morales also discouraged his employees, including Plaintiffs Cesar Duran, Indira Barriantos, and Kenny Barriantos, from seeking legal recourse for unpaid wages by bragging that he was "judgement proof" because his assets were held in Defendant Keren Torres' name. This coerced employees to continue working in hopes of collecting unpaid wages.

38.     In addition to refusing to pay employees and coercing them to continue working, Defendant Ixel Morales threatened employees who complained about non-payment by brandishing a handgun when employees demanded payment of unpaid wages.  In or around June of 2016, Plaintiff Cesar Flores Duran confronted Defendant Ixel Morales about unpaid wages and asked when he could expect payment. Defendant Ixel Morales, who was visiting the worksite during the employees' lunch break, gesticulated at his holstered handgun while berating

Mr. Duran. On a separate visit to the worksite in or around June of 2016, Defendant Ixel Morales un-holstered his loaded handgun and cleared live ammunition from the chamber in order to show his associate Josue Donai that his handgun was always ready for use. Plaintiff Cesar Flores Duran, who was present in the room where Defendant Ixel Morales was handling the loaded handgun, asked Defendant Ixel Morales why he would carry a gun to the worksite. Defendant Ixel Morales responded that the world was a dangerous place and he needed constant protection.

39.     Upon information and belief, Defendant Ixel Morales routinely drew attention to his weapon when confronted by employees seeking unpaid wages.

**Collective Action Allegations**

40.     Defendants routinely required Plaintiffs and similarly situated employees to work in excess of 40 hours in one workweek.

41.     Defendants had a legal obligation to pay their hourly-paid and salaried employees overtime wages of time-and-one-half their regular hourly rate of pay for every hour worked in excess of 40 hours each workweek.

42.     Despite Defendants' obligations under relevant wage and hour laws, Defendants intentionally created and implemented a system through which they denied Plaintiffs and similarly situated employees overtime wages.

43.     Upon information and belief, throughout the course of the Plaintiffs' employment, Plaintiffs and similarly situated employees were denied overtime wages:

    a.   Plaintiffs and similarly situated employees often worked up to 58 hours per week;

    b.   Defendants knew that Plaintiffs and similarly situated employees routinely worked 58 hours per week;

c.  Defendants insisted that Plaintiffs and similarly situated employees work 58 hours per week;

d.  Defendants threatened Plaintiffs and similarly situated employees to perform beyond 40 hours a week to retain employment;

e.  Defendants consistently reported and paid Plaintiffs' and similarly situated employees' overtime hours as regular hours.

44.  Defendants' compensation policies set forth above constitute willful, knowing, and intentional violations of the FLSA.

45.  Defendants authorized, assented to, or were aware of these violations and the work performed by the Plaintiffs and similarly situated employees.

46.  At no time did Plaintiffs perform work that meets the definition of exempt work under the FLSA.

47.  The collective action that Plaintiffs propose to maintain under the FLSA, 29 U.S.C. § 216(b), includes all similarly situated individuals who are or have been employed by Defendants as non-exempt, hourly-paid or salaried employees who were not paid time-and-one-half their regular hourly rate for every hour over forty (40) they worked in any given workweek during the Class Period.

48.  During the Class Period, the duties and responsibilities of the jobs held by individuals similarly situated to the Plaintiffs were the same or substantially similar to the duties and responsibilities of the jobs held by the Plaintiffs, in that all employees performed a variety of construction, carpentry, and drywall finishing jobs.

49.  During the Class Period, the harms suffered by individuals similarly situated to the Plaintiffs were the same or substantially similar to those suffered by the Plaintiffs, in that all

such employees are and were subject to the Defendants' unlawful compensation policies and practices described in this Complaint.

50. Accordingly, all members of the proposed collective action are "similarly situated" within the meaning of the FLSA, 29 U.S.C. § 216(b), and are therefore entitled to proceed on a collective basis.

51. The Plaintiffs are aware of various other similarly situated individuals: (1) who were employees of Defendants; (2) who were not paid as prescribed by law by Defendants; and (3) who had their wages unlawfully withheld by Defendants.

## Plaintiffs' Employment by Defendants

### *Jaime Alarcon Aguilar*

52. Plaintiff Jaime Alarcon Aguilar was employed by Defendant from May 16 to July 3, 2016.

53. Defendant Ixel Morales determined that Mr. Alarcon would be paid $18 per hour.

54. Though he is unsure of the exact hours he worked or payment he received, and does not have access to records, Mr. Alarcon estimates that from May 16 to June 27, Mr. Alarcon was paid about $1008 per week (56 hours at the regular rate of $18 per hour). For each week, he should have been paid $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour). Thus, for overtime hours he worked each of those 6 weeks, Mr. Alarcon is owed the difference of $144, for a total of $864.

55. From June 27 to July 2, 2016, Mr. Alarcon worked 56 unpaid hours for which he is owed $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour).

56. Mr. Alarcon is owed a total of $2016. To date, he has not received any of this pay.

### Indira Barriantos

57.     Plaintiff Indira Barriantos met with Defendant Ixel Morales after learning that Defendant Ixel Morales was looking for workers. Defendant Ixel Morales employed Ms. Barriantos from approximately March 25 to July 8, 2016.

58.     Defendant Ixel Morales determined that Ms. Barriantos would be paid $17 per hour.

59.     Over the course of 17 weeks working for Defendants, Ms. Barriantos worked approximately 306 hours of overtime (18 hours per week for 17 weeks).  For all 306 hours of overtime worked, Ms. Barriantos was paid her standard wage of $17 per hour instead of the overtime rate of $25.50 per hour. Therefore, Ms. Bonilla is entitled to the difference of $2601.

60.     In addition, Ms. Barriantos was not paid for the period of June 27 to July 8, 2016. Based on her normal schedule of 10 hours per day Monday through Friday and 8 hours on Saturday, she is owed 116 hours of unpaid wages totaling $1972.

61.     In total, Ms. Barriantos is owed at least $4573. To date, she has not received any of this pay.

### Kenny Barriantos

62.     Plaintiff Kenny Barriantos met with Defendant Ixel Morales after learning that Defendant Ixel Morales was looking for workers. Defendant Ixel Morales employed Mr. Barriantos from approximately April 10 to July 8, 2016.

63.     Defendant Ixel Morales determined that Mr. Barriantos would be paid $18 per hour.

64.     Over the course of 17 weeks working for Defendants, Mr. Barriantos worked approximately 252 hours of overtime (18 hours per week for 14 weeks).  For all 252 hours of

14

overtime worked, Mr. Barriantos was paid his standard wage of $18 per hour instead of the overtime rate of $27 per hour. Therefore, Mr. Barriantos is entitled to the difference of $2268.

65.     In addition, Mr. Barriantos was not paid for the period of June 27 to July 7, 2016. Based on his normal schedule of 10 hours per day Monday through Friday and 8 hours on Saturday, he is owed 108 hours of unpaid wages totaling  $1944.

66.     In total, Mr. Barriantos is owed at least $4212. To date, he has not received any of this pay.

### *Jose Benitez*

67.     Plaintiff Jose Benitez was recruited by a friend, Plaintiff Juan Flores, to work for Defendants. Mr. Benitez came to the worksite to meet with Defendant Ixel Morales. Defendant Ixel Morales gave the final approval for Mr. Benitez's employment.

68.     Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Benitez estimates that he worked for Defendants from April 1, 2016 to August 9, 2016.

69.     After discussing, Mr. Benitez and Defendant Ixel Morales agreed that Mr. Benitez would be paid $16 per hour.

70.     From July to August 2016, Mr. Benitez estimates that he worked 17 days without pay. Based on his usual schedule of 56 hours per week, Mr. Benitez estimates he is owed $2880 (120 hours at the regular rate of $16 per hour, plus 40 hours at the overtime rate of $24 per hour).

71.     In total, Mr. Benitez is owed at least $3148.80. To date, he has not received any of this pay.

*Hugo Bermudez*

72.     Plaintiff Hugo Bermudez was recruited by a friend to work for Defendant Ixel Morales. Defendant Ixel Morales gave the ultimate approval for Mr. Bermudez's employment. Mr. Bermudez was employed by Defendant Ixel Morales from approximately April 4 to May 20, 2016.

73.     Defendant Ixel Morales determined that Mr. Bermudez would be paid $17 per hour.

74.     Over the course of 6 weeks working for Defendants, Mr. Bermudez worked approximately 48 hours of overtime.  His regular work schedule was 9 hours per day Monday through Friday (45 hours per week). He also worked an 8 hour shift on two Saturdays. For all 48 hours of overtime worked, Mr. Bermudez was paid his standard wage of $17 per hour instead of the overtime rate of $25.50 per hour. Therefore, Mr. Bermudez is entitled to the difference of $408.

75.     In addition, Mr. Bermudez was not paid for the period of May 2 to May 20, 2016. He estimates that he worked 120 hours during that period, for which he has not been paid.  Thus, he is entitled to $2040 in unpaid wages for that period (120 hours at $17 per hour).

76.     In total, Mr. Bermudez is owed at least $2448 over the course of 17 weeks working for Defendants, Mr. Barriantos worked approximately 252 hours of overtime (18 hours per week for 14 weeks).  For all 252 hours of overtime worked, Mr. Barriantos was paid his standard wage of $18 per hour instead of the overtime rate of $27 per hour. Therefore, Mr. Barriantos is entitled to the difference of $2268.

77. In addition, Mr. Barriantos was not paid for the period of June 27 to July 7, 2016. Based on his normal schedule of 10 hours per day Monday through Friday and 8 hours on Saturday, he is owed 108 hours of unpaid wages totaling $1944.

78. In total, Mr. Barriantos is owed at least $4212. To date, he has not received any of this pay.

### Sandra Bonilla

79. Plaintiff Sandra Bonilla was hired by Defendant Ixel Morales as a drywall finisher. Defendant Ixel Morales employed Ms. Bonilla from approximately April 1 to July 15, 2016.

80. Defendant Ixel Morales determined that Ms. Bonilla would be paid $18 per hour.

81. During the months Ms. Bonilla was paid, she received the regular rate of $18 per hour. Over the course of her 15 weeks working for Defendants, Ms. Bonilla worked approximately 270 hours of overtime (18 hours per week for 15 weeks). Therefore, Ms. Bonilla is entitled to the difference of $2430.

82. According to Ms. Bonilla's personal records, she is owed 130 hours of unpaid wages. This equates to $2340 of unpaid hours at the regular rate of $18 per hour.

83. In total, Ms. Bonilla is owed at least $4770. To date, she has not received any of this pay.

### Vladimir Condori

84. Plaintiff Vladimir Condori was referred to Defendants by a friend. After a phone conversation, Defendant Ixel Morales agreed to hire Mr. Condori. Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Condori estimates that

he began working for Defendants around April 1, 2016 and ceased working for them around September 1, 2016.

85.     Defendant Ixel Morales offered to pay Mr. Condori $19 per hour, and Mr. Condori accepted.

86.     Defendants paid Mr. Condori for approximately 19 weeks before failing to pay the last two weeks of August. During the months Mr. Condori was paid, he received the regular rate of $19 per hour. This comes to $20,216. To account for overtime hours worked during those four months, Mr. Condori should have been paid $23,104 (40 hours per week at the regular rate of $19 per hour, plus 16 hours per week at the overtime rate of $28.50 per hour, multiplied by 19 weeks). Therefore, Mr. Condori is entitled to the difference of $2888.

87.     Though he is unsure of the exact hours he worked and does not have access to records, Mr. Condori estimates that he worked two weeks without pay. For his regular hours, Mr. Condori is owed $2432 (80 hours at the regular rate of $19 per hour, plus 32 hours at the overtime rate of $28.50 per hour).

88.     In total, Mr. Condori is owed at least $5320. To date, he has not received any of this pay.

### Cesar Flores Duran

89.     Plaintiff Cesar Flores Duran met with Defendant Ixel Morales after learning that Defendant Ixel Morales was looking for workers. Defendant Ixel Morales employed Mr. Duran from approximately March 15 to July 8, 2016.

90.     After negotiation surrounding Mr. Duran's particular skillset and ability to work on stilts, Defendant Ixel Morales determined that Mr. Duran would be paid $20 per hour.

91.     Mr. Duran worked 58 hours per week for 18 weeks totaling 324 hours of overtime due. For the 324 hours of overtime Mr. Duran worked, he was paid his normal his normal rate of $20 per hour instead of the overtime rate of $30 per hour. Thus, for overtime hours he worked throughout those 18 weeks, Mr. Duran is owed the difference of $3240.

92.     Mr. Duran estimates that he worked about 5 unpaid days for Defendants. Based on his usual schedule of 10 hours per day Monday through Friday, Mr. Duran estimates he is owed $1100 (40 hours at the regular rate of $20 per hour, plus 10 hours at the overtime rate of $30 per hour).

93.     In total, Mr. Duran is owed at least $4340. To date, he has not received any of this pay.

### Marcos Flores

94.     Plaintiff Marcos Flores was recruited by a friend to work for Defendants in framing and drywall. After a phone call with Defendant Ixel Morales, Defendant Ixel Morales gave his approval, and Mr. Flores was employed by Defendants in the beginning of February 2016.

95.     Defendant Ixel Morales told Mr. Flores that Mr. Flores would be paid $18 per hour and gave him the address of the worksite.

96.     Though he is unsure of the exact hours he worked and does not have access to records, Mr. Flores estimates that he worked three weeks unpaid. Based on his usual schedule, Mr. Flores estimates he is owed $3456 (120 hours at the regular rate of $18 per hour, plus 48 hours at the overtime rate of $27 per hour).

97.     In total, Mr. Flores is owed at least $3456. To date, he has not received any of this pay.

### *Juan Flores Lopez*

98.     Plaintiff Juan Flores Lopez worked for Defendants from approximately March to August 2016. His role was to frame and lay sheet. Mr. Flores Lopez cannot recall exactly when was he began his employment, but he estimates that his first day of work was in March 2016.

99.     Defendant Ixel Morales told Mr. Flores Lopez he would be paid $18 per hour.

100.     Though he is unsure of the exact dates and hours he worked and does not have access to records, Mr. Flores Lopez estimates that, from July 15 to August 9, 2016, he worked 17 days without pay. In total, he is owed $5256 (196 hours at the regular rate of $18 per hour, plus 64 hours at the overtime rate of $27 per hour).

101.     In total, Mr. Flores Lopez is owed at least $5256. To date, he has not received any of this pay.

### *Bernardo Martinez*

102.     Plaintiff Bernardo Martinez was recruited by a friend to work for Defendants. Mr. Martinez came to the worksite to meet with Defendant Ixel Morales. Defendant Ixel Morales gave the final approval for Mr. Martinez's employment.

103.     Though he is unsure of the exact dates and hours of his employment and does not have access to records, Mr. Martinez estimates that he was Defendants' employee from approximately July 15 to August 5, 2016, and that his normal schedule was 7a.m. to 3p.m., Monday through Friday.

104.     Defendant Ixel Morales determined that Mr. Martinez would be paid $17 per hour.

105.     Though he is unsure of the exact dates and hours he worked and does not have access to records, Mr. Martinez estimates that he worked 15 days without pay. Based on his

usual schedule of 40 hours a week, Mr. Martinez estimates he is owed $2040 (120 hours multiplied by the regular rate of $17 per hour).

106.    In total, Mr. Martinez is owed at least $2686. To date, he has not received any of this pay.

### *Hermes Marulanda*

107.    Plaintiff Hermes Marulanda met with Defendant Ixel Morales after learning that Defendant Ixel Morales was looking for workers. Defendant Ixel Morales employed Mr. Marulanda from approximately June 20 to August 20, 2016.

108.    Defendant Ixel Morales determined that Mr. Marulanda would be paid $18 per hour.

109.    Mr. Marulanda worked 58 hours per week for nine weeks totaling 162 hours of overtime due. For the 162 hours of overtime Mr. Marulanda worked, he was paid his normal his normal rate of $18 per hour instead of the overtime rate of $27 per hour. Thus, for overtime hours he worked throughout those nine weeks, Mr. Marulanda is owed the difference of $1458.

110.    Mr. Marulanda estimates that he worked about 12 unpaid days for Defendants. Based on his usual schedule of 58 hours per week, Mr. Marulanda estimates he is owed $2412 (80 hours at the regular rate of $18 per hour, plus 36 hours at the overtime rate of $27 per hour).

111.    In total, Mr. Marulanda is owed at least $3870. To date, he has not received any of this pay.

### *Carlos Molina*

112.    Plaintiff Carlos Molina approached Defendant Ixel Morales for a position in Spring 2016. After discussing with Defendant Ixel Morales, Mr. Molina was hired to work for Defendants starting approximately April 25, 2016.

113.    Defendant Ixel Morales determined that Mr. Molina would be paid $18 per hour.

114.    Though he is unsure of the exact hours he worked and does not have access to records, Mr. Molina estimates that he worked from approximately April 25 to approximately July 20. In that time, Mr. Molina was paid about $720 per week (40 hours per week at the regular rate of $18 per hour). This comes to $8640 over 12 weeks. For each week, he should have been paid $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour). This comes to $13,824 over 12 weeks. Thus, for overtime hours he worked throughout those 12 weeks, Mr. Molina is owed the difference of $5184.

115.    On July 20, 2016, after Defendants had repeatedly failed to pay him, Mr. Molina stopped working for Defendant.

116.    Mr. Molina estimates that he worked about 9 unpaid days for Defendants. Based on his usual schedule of 56 hours per week, Mr. Molina estimates he is owed $1692 (70 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour).

117.    In total, Mr. Molina is owed at least $7048.80. To date, he has not received any of this pay.

### Ruth Monje

118.    Plaintiff Ruth Monje was hired by Defendant Ixel Morales. Defendant Ixel Morales employed Ms. Monje from approximately March 1 to July 29, 2016. Ms. Monje worked as a drywall finisher.

119.    Defendant Ixel Morales agreed to pay Ms. Monje $18 per hour.

120.    For the 22 Saturdays she worked eight hours each, Ms. Monje was paid at the regular rate of $18 per hour. This comes to an estimated total of $3168 paid to Ms. Monje. Based on her usual schedule of 10 hours a day Monday through Friday, hours worked on Saturday

would exceed regular time and should have been paid at the overtime rate of $27.00 per hour. Thus, for the 22 Saturdays Mr. Montano worked, she should have been paid $4752. Therefore, Ms. Monje is owed the difference of $1584.

121.    Additionally, according to her records, Ms. Monje worked 80 hours unpaid. Therefore, she is owed $1440 (80 hours at the regular rate of $18 per hour).

122.    In total, Mr. Montano is owed at least $3024. To date, she has not received any of this pay.

**_Jhom Montano_**

123.    Plaintiff Jhom Montano had previously worked with Defendants to work on other projects, and had been properly paid in the past.

124.    Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Montano estimates that Defendants assigned him to the project around April 1, 2016 and that he ceased working for Defendants around September 1, 2016.

125.    Mr. Montano and Defendant Ixel Morales had discussed and agreed that Mr. Montano would be paid $19 per hour.

126.    For the 22 Saturdays he worked eight hours each, Mr. Montano was paid at the regular rate of $19 per hour. This comes to an estimated total of $3344 paid to Mr. Montano. Based on his usual schedule of 10 hours a day Monday through Friday, hours worked on Saturday would exceed regular time and should have been paid at the overtime rate of $28.50 per hour. Thus, for the 22 Saturdays Mr. Montano worked, he should have been paid $5016. Therefore, Mr. Montano is owed the difference of $1672.

127.    Toward the end of his employment with Defendants, Mr. Montano estimates he worked two weeks unpaid. Based on his regular schedule of 56 hours per week, Mr. Montano

estimates he worked 80 hours regular time, and 32 hours overtime. Therefore, he is owed $2432 (80 hours at the regular rate of $19 per hour, and 32 hours at the overtime rate of $28.50 per hour).

128.     In total, Mr. Montano is owed at least $4104. To date, he has not received any of this pay.

### Pedro Orellana

129.     Plaintiff Pedro Orellana was employed by Defendants from approximately May through July 2016.

130.     Mr. P. Orellana and Defendant Ixel Morales agreed that Mr. P. Orellana would be paid $18 per hour.

131.     Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Orellana estimates that he worked for Defendants for 53 days (from May 1 to July 1). Mr. Orellana estimates that, for 44 days, he was paid about $7920 (440 hours at the regular rate of $18 per hour, multiplied by 44 days). Based on his usual weekly schedule, Mr. Orellana estimates he is owed $9000 (320 hours at the regular rate of $18 per hour, plus 120 hours at the overtime rate of $27 per hour). Thus, Mr. Orellana is owed the difference of $1080.

132.     Additionally, Mr. Orellana worked 9 days without pay for a total 86 hours of work. Though he does not have access to his employment records, Mr. Orellana estimates that, based on his usual schedule, he is owed $1692 for those 9 days (70 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour).

133.     In total, Mr. Orellana is owed at least $2772. To date, Mr. Orellana has only been paid $400. Defendant still owes Mr. Orellana $2372.

### William Orellana

134.　Plaintiff William Orellana was recruited by a friend, Plaintiff Marcos Flores, to work for Defendants. After discussing with Defendant Ixel Morales, Mr. W. Orellana worked for Defendants from approximately the end of February to August 8, 2016.

135.　Defendant Ixel Morales told Mr. W. Orellana that Mr. W. Orellana would be paid $16 per hour.

136.　Though he is unsure of the exact hours he worked and does not have access to records, Mr. Orellana estimates that he worked on ten Saturdays without pay.

137.　For the ten Saturdays Mr. Orellana worked, he was paid about $1280 (eight hours on each of ten days, at the regular rate of $18 per hour). Because Mr. Orellana's usual hours from Monday to Friday add up to 48, additional Saturday hours are always overtime hours, and should have been paid at the overtime rate. Thus, he should have been paid $2160 (80 hours at the overtime rate of $27 per hour). Therefore, Mr. Orellana is owed the difference of $880.

138.　Over the course of his employment, Mr. Orellana estimates that he worked 120 hours without pay. Based on his usual schedule of 56 hours per week, Mr. Orellana estimates he is owed $2448 (88 hours at the regular rate of $18 per hour, plus 32 hours at the overtime rate of $27 per hour).

139.　In total, Mr. Orellana is owed at least $3328. To date, he has not received any of this pay.

### Jose Rivera

140.　Plaintiff Jose Rivera was recruited by his brother to work for Defendants. Mr. Rivera's brother arranged the job, and Defendant Ixel Morales gave the final word that Mr.

Rivera would be employed by Defendant CCS to do drywall and metal framing starting in or about June 2016. Mr. Rivera worked for Defendants until in or about August 2016.

141.    Defendant Ixel Morales told Mr. Rivera that Mr. Rivera would be paid $16 per hour.

142.    Defendant Ixel Morales instructed Mr. Rivera via text message what his hours would be, the address of the worksite, and the name and number of the foreman.

143.    Mr. Rivera worked eight hours a day, Monday through Friday, as well as two Saturdays.

144.    When Defendant Ixel Morales failed to pay Mr. Rivera, Mr. Rivera asked Defendant Ixel Morales to assign him to another worksite. When Defendant Ixel Morales refused, Mr. Rivera ceased to work for Defendants.

145.    Though he is unsure of the exact dates of nonpayment and does not have access to records, Mr. Rivera estimates that, over the course of Mr. Rivera's employment, he worked 14 days without pay. Based on his usual schedule of 40 hours per week, Mr. Rivera estimates he is owed $1792 (112 hours at the regular rate of $16 per hour).

### *Juan Rodas*

146.    Plaintiff Juan Rodas met with Defendant Ixel Morales after learning that Defendant Ixel Morales was looking for workers. Defendant Ixel Morales employed Mr. Rodas from approximately February 29 to August 9, 2016.

147.    Defendant Ixel Morales determined that, like the other employees who worked with sheetrock, Mr. Rodas would be paid $18 per hour.

148.    For Mr. Rodas's work from February 29 to July 15, 2016, Mr. Rodas earned approximately $19,152 ($18 multiplied by 56 hours per week for 19 weeks). However, he should

have earned $21,888 ($18 per hour for 40 regular hours per week, plus $27 per hour for 16 overtime hours per week, multiplied by 19 weeks). Therefore, Mr. Rodas is owed the difference of $2736.

149.    Though he is unsure of the exact dates and hours of his employment and does not have access to records, Mr. Rodas estimates that from July 15 to August 9, 2016, he worked three weeks without pay. When he asked Defendant Ixel Morales about the unpaid wages, Defendant Ixel Morales agreed to pay if Mr. Rodas would help for one day at another worksite in Arlington. (Though Mr. Rodas does not recall the address of the other worksite, he did not work with Defendant CCE.) Mr. Rodas agreed and performed 10 hours of labor, for which Defendant Ixel Morales also failed to pay him. In total, he is owed $3636 (130 hours at the regular rate of $18 per hour, plus 48 hours at the overtime rate of $27 per hour).

150.    In total, Mr. Rodas is owed at least $6372. To date, he has not received any of this pay.

### *Manuel Rodriguez Hernandez*

151.    Plaintiff Manuel Rodriguez Hernandez worked for Defendant CCS from approximately early-March to July 5, 2016. Though he is unsure of the exact dates of his employment and does not have access to records, Mr. Rodriguez estimates that he began working for Defendants on March 5, 2016. Mr. Rodriguez's role was to lay sheetrock and finish drywall for Defendant.

152.    Defendant Ixel Morales told Mr. Rodriguez that Mr. Rodriguez would be paid $18 per hour.

153.    For Mr. Rodriguez's work from March 5 to June 25, 2016, Mr. Rodriguez earned approximately $16,128 ($18 multiplied by 56 hours per week for 16 weeks). However, he should

have earned $18,432 ($18 per hour for 40 regular hours per week, plus $27 per hour for 16 overtime hours per week, multiplied by 16 weeks). Therefore, Mr. Rodriguez is owed the difference of $2304.

154.    By June 2016, Defendant was no longer making timely payments. From June 25 to July 5, Mr. Rodriguez worked a total of nine days without pay. For June 25, Mr. Rodriguez is owed $144 (eight hours at the regular rate of $18 per hour). For the week of June 27 to July 2, Mr. Rodriguez is owed $1152 (40 hours at the regular rate of $18 per hour, plus 16 hours at the overtime rate of $27 per hour). For July 4 and 5, Mr. Rodriguez is owed $360 (20 hours at the regular rate of $18 per hour). This comes to $1656.

155.    For all of his unpaid and incorrectly paid work from March 5 to July 5, 2016, Mr. Rodriguez is owed a total of $3960. By the time Mr. Rodriguez left Defendant CCS in July, Defendants had paid Mr. Rodriguez $600 toward that balance, meaning that, when he left Defendant CCS, Mr. Rodriguez was owed at least $3360. To date, he has not received any of this pay.

## FAIR LABOR STANDARDS ACT CLAIMS

156.    At all times relevant to this action:

    a.    Plaintiffs, and all others similarly situated, were Defendants' "employees" within the meaning of 29 U.S.C. § 203(e)(1);

    b.    Defendants were the "employers" of Plaintiffs, and all others similarly situated,  within the meaning of 29 U.S.C. § 203(d);

    c.    Defendants "employed" Plaintiffs, and all others similarly situated, within the meaning of 29 U.S.C. § 203(g); and

d.      Plaintiffs, and all others similarly situated, were engaged in commerce, or were employed by Defendants in an enterprise engaged in commerce, within the meaning of 29 U.S.C. § 203(b).

### <u>Count 1</u>:
### Failure to Pay Minimum Wages, 29 U.S.C. § 2016

157.    Defendants were required to pay Plaintiffs, and all others similarly situated, at least $7.25 for each hour they worked.

158.    As set forth above, Defendants repeatedly failed to pay Plaintiffs, and all others similarly situated, any wages at all at various times over the course of the employment of Plaintiffs and all others similarly situated, to the injury of Plaintiffs and all others similarly situated, and are thus jointly and severally liable to Plaintiffs, and all others similarly situated, for damages.

159.    WHEREFORE, Defendants are liable to Plaintiffs, and all other similarly situated individuals, under the FLSA, § 216(b), for all unpaid wages, plus an equal amount in liquidated damages, interest (both pre- and post- judgment), attorney's fees, costs, and any other and further relief this Court deems appropriate.

### <u>Count 2</u>:
### Failure to Pay Overtime Wages, 29 U.S.C. § 207

160.    Section 207(a)(1) of the FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

161.    Plaintiffs, and all others similarly situated, were "employees" and Defendants were their "employers" under the FLSA, § 203.

162.     As set forth above, Defendants violated the FLSA by knowingly failing to compensate Plaintiffs, and all other similarly situated individuals, the rate of time-and-one-half (1½) their regular hourly rate for every hour worked in excess of forty (40) hours in any one workweek.  Indeed, Defendants never paid Plaintiffs, and all others similarly situated, any overtime premiums at all.

163.     In addition, by deducting 2% of the Plaintiffs' promised wage of Plaintiffs, and all others similarly situated, without the consent of the Plaintiffs and all others similarly situated, defendants failed to pay Plaintiffs, and all others similarly situated, their properly calculated overtime premium for those weeks in which the Plaintiffs, and all others similarly situated, worked overtime, thus violating the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 207, to the injury of those Plaintiffs and all others similarly situated, and are thus jointly and severally liable in damages to those Plaintiffs, and all others similarly situated.

164.     WHEREFORE, Defendants are liable to Plaintiffs, and all other similarly situated individuals, under the FLSA, § 216(b), for all unpaid overtime wages, plus an equal amount in liquidated damages, interest (both pre- and post- judgment), attorney's fees, costs, and any other and further relief this Court deems appropriate.

## VIRGINIA STATE LAW CLAIMS

### Count 3:
### Breach of Contract (Defendant Capital Commercial Solutions, LLC only)

165.     Each Plaintiff reached an agreement with Defendant Capital Commercial Solutions, LLC whereby Defendant Capital Commercial Solutions, LLC would pay that Plaintiff a certain hourly wage in exchange for that Plaintiff's performing construction work for Defendant Capital Commercial Solutions, LLC.  Employment contracts were thus formed under Virginia law.

166.     Defendant Capital Commercial Solutions, LLC failed to pay Plaintiffs for all the hours they worked, thus breaching its contract with Plaintiffs.

167.     In addition, by deducting 2% of the Plaintiffs' promised wage without the consent of the Plaintiffs, Defendant Capital Commercial Solutions, LLC failed to pay Plaintiffs their entire wage as promised, thus breaching its contract with Plaintiffs.

168.     As a result of Defendant's breaches, Plaintiffs have suffered damages.

169.     WHEREFORE, Defendants are liable to Plaintiffs for the economic harms caused by Defendant's breach of contract, including the payment of wages due, prejudgment interest, and other compensation and damages that Plaintiffs would have received but for Defendant's breach of contract.

### Count 4:
### Conversion (Defendants Capital Commercial Solutions, LLC and Ixel Morales only)

170.     By taking from the Plaintiffs 2% of all money they earned in the form of a purported "check cashing fee" to which the Plaintiffs did not consent and from which the Plaintiffs did not have the right to opt out, Defendants Capital Commercial Solutions, LLC and Ixel Morales did wrongfully and without consent convert the Plaintiffs' money to their own property, and are thus jointly and severally liable to the Plaintiffs for conversion. Defendants Capital Commercial Solutions, LLC and Ixel Morales did this willfully and wantonly, with conscious disregard of the rights of the Plaintiffs.

171.     WHEREFORE, Defendants are liable to Plaintiffs for the economic harms caused by Defendants Capital Commercial Solutions, LLC and Ixel Morales' conversion, including the payment of wages due, prejudgment interest, and other compensation and damages that Plaintiffs would have received but for Defendants' conversion.

## <u>RELIEF REQUESTED</u>

Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that the Court provide the following relief:

1.      Declare this action to be maintainable as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), and direct Defendants to provide to Plaintiffs a list of all persons employed by them as hourly and salaried employees during the Class Period, including the last known address and telephone number of each such person, so that Plaintiffs can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it.

2.      Award Plaintiffs and all others similarly situated actual damages under FLSA in the amount of all unpaid minimum and overtime wages as set forth above, jointly and severally against all Defendants, in an amount to be proved at trial;

3.      Award Plaintiffs and all others similarly situated an additional amount of liquidated damages equal to their actual damages, pursuant to 29 U.S.C. § 216(b), jointly and severally against all Defendants;

4.      Award Plaintiffs their costs and reasonable attorney's fees, as provided by 29 U.S.C. § 216(b), jointly and severally against all Defendants;

5.      Award Plaintiffs their contract damages under Virginia law, in an amount to be proved at trial, against Defendant Capital Commercial Solutions, LLC only, as well as prejudgment interest of six percent from the date of breach;

6.      Award Plaintiffs a judgment for the total amount of money taken from them in the form of unlawful and non-consensual "check cashing fees" by Defendants Capital Commercial Solutions, LLC and Ixel Morales, under a conversion cause of action, in an amount to be proved

at trial, jointly and severally against those two defendants, as well as prejudgment interest of six percent from the date of breach;

7.     Award Plaintiffs punitive damages on their conversion cause of action, in an amount to be proved at trial and in the discretion of the jury, jointly and severally against Defendants Capital Commercial Solutions, LLC and Ixel Morales; and

8.     Grant any other relief the Court deems just and proper.

Plaintiffs demand trial by jury.

Respectfully submitted,

By: _____//s//_____     Date: 3/31/2017
Simon Sandoval-Moshenberg (VSB No. 77110)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike #520
Falls Church, Virginia 22041
(703) 720-5605 / Fax: (703) 778-3454
simon@justice4all.org

Kevin H. Metz (VSB No. 89861, E.D. Va. application pending)
kevin.metz@lw.com
Brian A. Lichter (*pro hac vice* forthcoming)
brian.lichter@lw.com
Christopher M. Ting (*pro hac vice* forthcoming)
christopher.ting@lw.com
Gaston Soler (*pro hac vice* forthcoming)
Gaston.Soler@lw.com
Latham & Watkins LLP
555 Eleventh St., NW Suite 1000
Washington, D.C. 20004
Phone: (202) 637-2200
Fax: (202) 637-2201

Christine T. Dinan (VSB No. 84556)
christine_dinan@washlaw.org
Matthew K. Handley (*pro hac vice* forthcoming)
matthew_handley@washlaw.org
Washington Lawyers' Committee for Civil Rights and Urban Affairs
11 DuPont Cir., NW Suite 400
Washington, D.C. 20036
Phone: (202) 319-1000
Fax: (202) 319-1010

*Counsel for the Plaintiffs*

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on March 31, 2017, I served a copy of the

foregoing on all counsel of record through the Court's CM/ECF system, which then sent a

notification of such filing (NEF) to all counsel of record who are registered with that system:

Thomas M. Brownell, Esq.
Holland & Knight LLP
1650 Tysons Blvd., Suite 1700
Tysons, VA 22102
703-720-8690 – Telephone
703-720-8610 –  Fax
Thomas.brownell@hklaw.com
*Counsel for defendant CCE Specialties, LLC*

I also served the following unrepresented defendants, by U.S. Mail, at their last known

addresses, as follows:

Capital Commercial Solutions, LLC
Ixel R. Morales
Keren Torres
6300 Lincolnia Road
Alexandria, VA 22312

By: _____//s//_____
Simon Sandoval-Moshenberg (VSB No. 77110)
LEGAL AID JUSTICE CENTER
6066 Leesburg Pike #520
Falls Church, Virginia 22041
(703) 720-5605 / Fax: (703) 778-3454
simon@justice4all.org